## Jackson v. The Bank of the United States.

A foreign attachment against A. was served on B. as garnishee, after which A., acting as agent for third persons, deposited cash in his own name with B., and also procured B. to purchase or discount drafts drawn by him in his own name, though in fact as agent, which were paid by his principals. A. drew out the funds by his checks, and applied them in the business of his principals. B. is liable to the attaching creditor, although the jury found that all the funds were deposited and drawn out by A., as agent for others.

In a *scire facias* against a bank garnishee in such case, the cashier is a competent witness for defendant, although the money was paid out on A.'s checks, by his direction.

On writ of error taken by plaintiff in foreign attachment to proceedings against the garnishee, the court cannot notice an alleged error in a judgment for plaintiff, on plea of *nul tiel record* to the *scire facias* against the garnishee.

F

IN error from the District Court of Philadelphia.

*Feb.* 6, 7. This was a foreign attachment against William Sidney Warwick, and Claggett, in which the Bank of the United States was garnishee. To a *scire facias* against the garnishee, the bank pleaded *nul tiel record*, and the court gave judgment against them. No bill of exceptions was sealed; and, on this writ of error, sued out by the plaintiff below, one question was, whether the defendants in error could show that that judgment should have been in their favour, thus ending the case. The judgment of this court renders it unnecessary to set forth the grounds of the alleged error.

The main question was, whether certain funds were subject to the attachment.

The writ was served in 1837, the *sci. fa.* issued October, 1838, and the interrogatories were filed in 1845.

On the trial, it appeared that Warwick, one of the defendants, opened an account, in his own name, with the Bank of the United States, commencing in November, 1838, and terminating in 1840. The credit side of the account was composed of three classes of items.

> Two bills, drawn by Warwick on Claggett, in London, discounted or purchased by the bank, November 19th and 20th, 1838, for . . . . $24,333 33
>
> Six bills, drawn by Warwick on Rogers & Co., of New York, three of which were discounted February 18th, and three on May 28th, amounting in all to . . . . . . . . . . . . 69,425 00
>
> Deposits of cash amounting to . . . . . . . 13,196 47

These amounts had been paid out by the bank, on the checks of Warwick, and his account nearly balanced. The garnishees alleged these funds were not the property of Warwick, but that he held them as an agent for others.

Sagory, who was a partner of Rogers & Co., proved that the drafts on that house, discounted by the bank, had been paid by Rogers & Co., at maturity, and the proceeds were applied by Warwick to the purchase of tobacco on their account, in which, as well as in drawing the drafts, he acted as their agent. He also believed the two foreign bills were not for Warwick's account; but most of the books of Rogers & Co. having been burnt, he could not find any entries relating to them. At that time Warwick was a bankrupt, and had no property. It appeared that the foreign bills were purchased by the bank on a letter of credit of Rogers

& Co.` And Rogers testified that, as he was not in the habit of guaranteeing for others, it was more than probable these bills were for account of his house.

The cashier of the bank also proved, that the foreign bills were purchased on the letter of Rogers & Co., and, as security, Rogers & Co.'s tobacco certificates were handed to him. (It was said, Rogers & Co. had the tobacco contract with the French Government.) And he believed the proceeds of the bills were applied to the purchase of tobacco for that house.

Warwick, who was examined, corroborated these statements as to the proceeds of the domestic and foreign bills. As to the cash items, he said, he received from Rogers & Co. and other parties, all residing in the United States, funds to be used on their account, which were deposited in the bank, and constituted the cash items. The checks were drawn against these credits, and applied on account of the parties to whom the credits belonged.

FINDLAY, J., instructed the jury—1. As to the cash items, if he deposited with the bank the money of others, it was there clothed with a trust, and, if so, the funds were not liable to an attachment. 2. If the domestic bills were drawn on Rogers & Co. by Warwick, as their agent, and the proceeds applied to the purchase of tobacco for them as agent, and they paid the drafts, the proceeds of these bills were not attachable. 3. If the proceeds of the foreign bills were received under a trust; that is, if Rogers & Co. employed Warwick to raise money, by drawing bills which they guaranteed, the proceeds belonged to them, and not to Warwick, and hence were not liable to the attachment.

The admission of the cashier, as a witness for the defendants, was also assigned for error. He stated the money had been paid out on Warwick's checks, by his order or direction; and that he had given bond for the faithful performance of his duties; and he had resigned.

*Waln*, for plaintiff in error.—The cashier was liable for the misapplication of these funds, which was made under his direction; 8 Wheat. 360; 3 W. & S. 376. Story on Ag., §114. The deposits, by Warwick, with the bank, were but a simple debt due by them. They constituted part of the capital of the bank with which they traded, and to no one were they accountable but to Warwick; nor was there any special characteristic in their engagement with him, other than with their common creditors.

Supposing the case made out as to the bills, there is, then,

the large item of cash, of which no account is given but by War-wick, who says it was received from others. The names of the real owners are not mentioned, and this in a transaction of $13,000. But the law is, where the agent receives and deposits money as his own, with no separation from his funds, or special designation—when the specific property of the principal cannot be identified—he becomes a mere debtor to his principal, and creditor of the depositary. This must be the rule, or there is a wide door opened for fraud. It is applied to render agents liable for losses in such cases, on the ground that they have made the debt theirs by mixing the funds: 4 Mad. 414; 1 J. W. 247; 11 Ves. 377. In this case the liability of the proceeds of a bill to attachment by a creditor of the banker is admitted by Lord Eldon, Ib. 381; 3 Ib. 365, n.; 2 Stor. Eq. § 1270. So in 11 Ves. 59, it is said to be a using in the course of trade, because he gets a credit by it—and in 15 Ib. 470, that it would be part of the agent's assets: Lew. on Trusts, 300. The distinction on which the right of property depends is, whether the identical thing, or its value, is to be returned: 7 Cow. 752. Thus, money paid into a banker becomes a debt, not a deposit: 1 Mer. 528, 577, 80.

*Cadwalader* and *Sergeant*, (*Brooke* was with them,) contrà—Argued, that the variance between the return and the recital in the *sci. fa.* was fatal, and entitled the garnishees to judgment on the plea of *nul tiel record*, and that the return to the foreign attachment was part of the record, and properly brought up by *certiorari* on a suggestion of diminution; hence the variance must be noticed by the court: Yelv. 218; Cro. Jac. 331; Jenk. 7th c. pl. 32. The whole record should be sent up at once in Penna. 2 Bin. 439. This *sci. fa.* is not an original, but in the nature of an execution—and *oyer* could not have been craved of the proceedings on which it was founded: 1 Chit. Pl. *Oyer*. The point was decided in 3 Salk. 320, 21; Ld. Ray. 216. So in 2 Bulst. 10, it is said to be a proceeding in the same case. A bill of exceptions would be improper for the matter alleged and already certain: 2 Inst. 427. If the funds deposited were the property of one person, he could follow it, and there can be no difference where there are several owners. The doctrine in Tayler *v.* Plummer, 3 M. & Sel. 562, is broad enough to cover the case, and it was there held that no change of form could alter the rights of an owner to property clothed with a trust, which was approved in 3 W. & S. 377–8. In Willes 400, and 1 Salk. 160, the property was sold, and a note taken, which was held to be

immaterial. 1 Y. & J. 216, was a case of goods consigned by a factor, and a bill drawn and paid without notice, but the title did not pass.   In Cowp. 197, and Corking *v.* Jarrard, cited in 2 Brod. & Bing. 371, the defendants had acted in bad faith, but not so in the case in Willes.   This court has carried out the rule in 11 S. & R. 377, and 2 Penna. 347, that funds improperly applied by an agent may always be followed, unless received *bonâ fide* for value, and without notice.   No case, however, is stronger than the much-contested one of Small *v.* Attwood, 1 Young, 407.   It was there conceded that certain bank-notes paid on a contract set aside by the court, had been paid into a banker, and an equal amount invested by him in stocks—and the Chancellor said it was immaterial whether the identical notes were so used, or other funds of the same value.   The cases cited are not similar.   The point there was, whether the agent was personally liable for putting the funds to this hazard, not whether the principal could not follow them if he chose.   As to the bills, their proceeds could in no case be attached—it would be a fraud.   They were purchased, and to say the bank was bound to withhold the agreed price would be to compel them to commit a fraud.

*Meredith*, in reply.—The record and judgment against the defendant is no part of this record, as the plea of *nul tiel record* shows. The *sci. fa.* is an original proceeding against the garnishee, and the objection to the judgment on which it was founded, should have been taken by bill of exceptions: 2 Saund. 72 n. q.   It is like a proceeding against bail.   The only way to determine whether this fund, received from, and paid to Warwick, is liable to the attachment for his debts, is to see whether it had any earmark by which the ownership could be identified.   Clearly no one was a creditor but Warwick—nor could the bank have refused payment of his checks on the ground that they belonged to other persons. 15 E. 62, settles that in such case none but the agent is entitled.   Suppose the bills were purchased; to say that the bank was justified in paying over the price, would be to repeal the act which binds all effects coming into the hands of the garnishee after the attachment; but in fact they were discounted, and the proceeds passed to Warwick's credit.

*March* 19.   COULTER, J.—We lay aside the record of the judgment of the court below, on the plea of *nul tiel record*, which was brought into this court at the instance of the defendant in

error, upon a suggestion of diminution of record. It is, as we think, not properly before us. Upon the trial of the issue, upon the plea of *nulla bona*, the defendant did not interpose the existence of a judgment on that plea: he could not, because it was against him. He might have taken a writ of error, and thus have brought that judgment into this court, to be tested by the law on the subject. But when the plaintiff has brought the proceedings on the issue of *nulla bona* to this court, on a writ of error, how can we examine a previous judgment of the court, on a collateral issue, to which the plaintiff assigns no error? It has not been the practice, to throw the proceedings in the court below into hotchpot, upon a writ of error by one party, and to balance errors committed against him, by errors committed against his adversary.

I do not perceive how this court could reverse the judgment on the issue of *nul tiel record*, because the party against whom it was rendered, has not complained of it, or brought it here; except as an offset to the errors assigned to the judgment on the other issue. To the *scire facias*, the defendant pleaded *nulla bona*. That issue was decided in his favour. The judgment, if right, is final against the plaintiff; and, if there were errors on the trial, fundamental errors, the law allows him to have them corrected. He has brought the record of the trial, and the charge of the court, upon a bill of exceptions. These will be examined, because they are legitimately before us.

As the cause will go back, the defendant will, of course, take such measures as he thinks best to give him the full benefit of the radical defect, as he alleges, which entitled him to judgment on the issue of *nul tiel record*. Upon that alleged defect, we express no opinion whatever, as it may perhaps come again, in proper shape, before us.

There is nothing in the exception to the admission of Cowperthwait as a witness. He may have some remote interest in the controversy; but it is too remote to affect his competency: it may weigh against his credit. The general rule is, that an agent may be admitted as a witness: we see nothing in this case to take it out of that general rule. Indeed, he probably acted under instructions from the garnishee, who now appears, adopts, and defends his acts.

The main questions arise on the instructions of the court to the jury. [His honour here stated the three points.]

It is admitted and proved that all the deposits of money and the drafts and bills were made by Warwick after the attachment was

served on the Bank of the United States, and paid out by them on the drafts and checks of said Warwick.

The witnesses to prove the trust were Warwick himself, Cowperthwait, the cashier of the bank, and Rogers and his partner, Sagory. I make no remark on the facts as proved by these witnesses, because, the jury having found the fact that the moneys and effects belonged to Rogers & Co., that matter is closed up on this proceeding, except as illustrative of principles properly applicable to the case.

The attachment is *in rem* for the purpose of compelling the appearance of the defendant; and if Warwick, instead of drawing this money out of the bank, had appeared and entered bail to the action, the money would have been free, and the bank might then have paid it to him. But the garnishee chose to be sole judge and umpire, and pay out the money to Warwick on his checks, thus in fact recognising his right to the possession and control of the money, and yet taking the hazard of defeating the object of the attachment. The first question that occurs is this: could the bank, if the attachment had not been served, have resisted the claim of Warwick to the money he had deposited with them? They received it and the bills as his, entered them on their books as his, and were bound, in the absence of any attachment, to have paid the funds to him. How, then, were they placed in a better situation by the service of the attachment? The attaching creditor stands in the place of Warwick. If they could not allege as against Warwick, that the funds were not his, neither can they allege against the attaching creditor that they are not his, and yet turn round and pay the money to Warwick, to enable him to defeat his creditor. In Sergeant on Attachment, 94, it is said that the garnishee may plead everything to the *scire facias* which he could plead against the defendant; and if they could have pleaded against the defendant that the money and the products of the bills were not his, why did they pay them to defendant after being warned by attachment? The law countenances not those operations by which its legitimate force and effect may be evaded. Thus, in the case of Silverwood *v.* Bellas, 8 W. 420, it was resolved that Silverwood, the garnishee, who had received money in *trust*, to deliver it over to the defendant, was liable because he did deliver it over. Here it cannot be gainsayed but that the bank was bound to deliver over the money to the defendant in the absence of the attachment. It is worthy of remark that the person alleged by the garnishee to be the *cestuis que trust*, never gave notice to the attaching creditor

of any claim—never appeared in court to move that the attachment should be quashed, nor took any step asserting ownership, or indicative of it.

The ownership of the defendant is evidenced and maintained by the customary evidence of right, that is, the deposit in the bank in his own name, the books of the bank, the drawing of bills and checks in his own name. Under these circumstances, it is against public policy that the garnishee, that is, the bank, should be permitted to allege that the books were false, for the purpose of defeating the creditor, and yet true for the purpose of paying over the funds to the defendant. Here is the case of a man who had been declared a bankrupt in England, and came to this country and transacted a business to the amount of one hundred thousand dollars and more in the United States Bank, in his own name, and when the funds are attached in the hands of the institution, they are paid over to the defendant—not paid to the person who is alleged to have been the *cestui que trust*, and the defendant, the *cestui que trust*, and the cashier, are the witnesses to make out the case. It is impossible to look upon the case without vehement apprehension that, if it is allowed to pass into precedent, and make the law of analogous cases, the most disastrous frauds might be the result. The house of Rogers & Co. was located in New York, Rogers himself was absent on the continent of Europe, and Sagory, the partner, in New York, swears that he knew Warwick personally first in the year 1837, which shows that confidence was of marvellously rapid growth. Whether the debt of the plaintiffs was incurred by Warwick in the course of his dealing on the strength of this fund or not, is not particularly stated in the case. We fear it would open too wide a door for the infliction of fraud, if such practices were tolerated. An individual made out to be insolvent, may have $100,000, nay, twice that amount, in a bank, entered on its books in his own name, his checks accepted and paid. What amount of credit may he not obtain upon this lure held out to the community? If the cashier, and the party claiming the money, or any other persons, are permitted to prove that the entries are untrue, that the depositor has not a cent in the bank, the injury may be deep and grievous to credit, and the source of severe loss to those who have put faith in the integrity and uprightness of banking institutions. The law will not give its help to assist one man to cheat others. It is on this principle that a real *bonâ fide* change of possession, apparent to the public, must accompany and follow the sale of chattels in order to take them

out of the power of the creditor of the vendor. Indeed, the whole fabric of the 13 Eliz. is built on this foundation; and it is of no consequence whether or not there was actual fraud, in the absence of this essential ingredient of change of possession. It is public policy, and the danger of opening a door for fraud, which furnishes the reason and the justification of the rule, and which are so strong and emphatic as to overbear particular instances. So in this analogous case the danger is the same, and the remedy is not different. In both the apparent state of things, that which meets the eye of the public, ought to govern. The garnishee, in this instance, after having paid the money to the defendant, and by its own books, papers, and records, given the evidence that it was his, shall not be permitted to allege the contrary for the purpose of protecting itself in a wrongful act. The duty of the garnishee was, having received the money and bills as the money and bills of Warwick from himself, to have retained them until liberated by due course of law. Warwick says in his testimony, "As to credits for cash credited in my account, I state that I received from Rogers & Co., and other persons in the United States, on and subsequent to November, 1838, funds to be used on their account, which funds were deposited by me in the Bank of the United States." The names of the other persons are not given. But the sums and amounts are all blended into one, and deposited as his own. Now, where is the earmark, about which much was said? How much belonged to Rogers & Co., and how much and in what sums to the others unknown? There are some things which appear plausible, but this assertion of Warwick being the trustee of persons unknown, passes credulity. Even suppose he got this money from many persons, and used it as his own, he became the debtor of those persons, and they lost their grip on the fund. And by mingling this fund with the products of the bills, domestic and foreign, and using the whole as his own, *ad libitum*, and depositing it as such in the bank, this deposit in the bank, so made and evidenced, created a debt or duty from the bank to Warwick, and not any specific or distinct debt or duty to Rogers or the other persons unknown. The debt or duty to Warwick was entire and in mass; and, by paying it to him in the face of the attachment and garnishment, the defendants became liable to the plaintiff in attachment.

There was slight evidence, indeed, that the money raised on the foreign bills drawn by Warwick, and endorsed by Rogers & Co., were used by Warwick for the benefit of Rogers & Co.—*too*

slight to lean upon, and yet a sufficient shadow of testimony to go to a jury. Cowperthwait says he believes so—that is all, without stating any grounds upon which that belief was founded.

Judgment is reversed upon the third, fourth, and fifth errors assigned, and a *venire de novo* awarded.